UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Terry Bryant,
        Plaintiff

        v.                                  Case No. 11-cv-217-SM
                                            Opinion No. 2013 DNH 077
Liberty Mutual Group, Inc.,
        Defendant

## O R D E R

In her ten-count amended complaint, Terry Bryant asserts
that her former employer, Liberty Mutual Group, unlawfully
terminated her employment and then coerced her into signing a
release of claims.  She says the release is unenforceable, and
she seeks damages for alleged acts of unlawful discrimination and
wrongful termination.  Liberty Mutual moves for summary judgment
on each of Bryant's claims, as well as on each of its own
counterclaims.  That motion is granted with respect to Bryant's
claims.  But, for the reasons discussed below, Liberty Mutual's
counterclaims are dismissed.


## Standard of Review

When ruling on a motion for summary judgment, the court must
"view the entire record in the light most hospitable to the party
opposing summary judgment, indulging all reasonable inferences in
that party's favor."  Griggs-Ryan v. Smith, 904 F.2d 112, 115

(1st Cir. 1990).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence."  Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).  Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with evidence that conflicts with that proffered by the moving party.  See generally Fed. R. Civ. P. 56(c).  It naturally follows that while a reviewing court must take into account all properly documented facts, it may ignore a party's bald assertions, unsupported conclusions, and mere speculation, see Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997), as well as those allegations

"which have since been conclusively contradicted by [the non-moving party's] concessions or otherwise," Chongris v. Board of Appeals, 811 F.2d 36, 37 (1st Cir. 1987).  Moreover, the non-moving party cannot create a dispute concerning material facts by simply submitting an affidavit that contradicts her earlier deposition testimony (or answers to interrogatories) without providing an adequate explanation for that discrepancy.  See Colantuoni v. Alfred Calcagni & Sons, 44 F.3d 1, 4-5 (1st Cir. 1994).  See also Torres v. E.I. Dupont de Nemours & Co., 219 F.3d 13, 20 (1st Cir. 2000).


**Background**

Bryant graduated from high school in 1975 and then attended Anderson School of Business, where she took a few college courses before entering the workforce.  She held various retail sales positions, worked as a special education aide in the Milton, New Hampshire, school system, and was a purchasing agent for Cabletron Systems.  While at Cabletron, she received a number of promotions, rising to the position of "Senior Worldwide Non-inventory Buyer."


In September of 2005, she began working for Liberty Mutual as a supervisor, overseeing the work of four other employees.  In the winter of 2010, Liberty Mutual says it became concerned about

3

a substantial backlog of work in Bryant's department.  On
February 10, 2010, two of Bryant's supervisors expressed those
concerns to her.  A week later, on February 17, a representative
from Liberty Mutual's human resources department informed Bryant
that, because of the substantial volume of unprocessed work in
her department, the company was going to initiate disciplinary
action.

    According to Bryant, the representative from the human
resources department then informed her that she had three
options: allow the disciplinary process to proceed and await its
outcome, voluntarily quit, or agree to a mutual separation.
Bryant claims she was told that if she did not affirmatively
elect one of those options before the close of business, she
would be fired for gross misconduct.  Moreover, says Bryant,
based on what she had observed during her tenure at Liberty
Mutual, she believed if she allowed the disciplinary process to
proceed she would inevitably be fired for cause and, therefore,
be ineligible for unemployment benefits.  Similarly, she realized
that if she voluntarily quit, she would not receive unemployment
benefits.  Accordingly, she thought her only viable option was to
agree to a mutual separation agreement.

Bryant did not, however, make an immediate decision as to how she wished to proceed. Instead, she says she told the human resources representative that she "would consider the mutual separation." Bryant Deposition, Volume II (document no. 54-7) at 93 and 96. Accordingly, she asked Liberty Mutual to send her the relevant paperwork so she could review it and discuss it with her husband. Id. at 93, 99-101. Despite her assertion that she was told she would be discharged for "gross misconduct" if she did not affirmatively elect one of the three options that day, Bryant was not fired. In fact, she testified that no one at Liberty Mutual ever fired her or told her that she was "fired." Bryant Deposition, Volume I (document no. 54-5) at 101.

The following day, Liberty Mutual e-mailed Bryant a collection of documents. It was explained to Bryant that upon separation from Liberty Mutual she would receive all salary and vacation pay to which she was entitled, and she was informed of the availability of insurance benefits under COBRA. She was also told that Liberty Mutual would provide her with severance benefits if she elected to sign the enclosed severance agreement and general release. Among other things, the agreement provided that Bryant:

  1. Acknowledged that, absent her signature to the agreement, she was not entitled to severance benefits;

2.     Knowingly and voluntarily released any claims
       she might have against Liberty Mutual as of
       the date of the agreement, including more
       than 20 specifically identified state and
       federal statutory and common law claims;

3.     Had not relied upon any representations,
       promises, or agreements outside of those set
       forth in the severance agreement itself;

4.     Had forty-five days within which to review,
       consider, and sign the agreement;

5.     Had been advised to consult with an attorney
       prior to signing the agreement; and

6.     Had an additional seven days <u>after</u> signing
       the agreement to revoke her assent.

<u>See</u> Severance Agreement and General Release (document no. 5-3)

("Severance Agreement").


     Bryant read the Severance Agreement, discussed it with her

husband, and signed it on February 18, 2010.  She claims,

however, that she was coerced into signing the document because a

representative of Liberty Mutual told her she would be terminated

for cause if she did not sign and return the document

immediately.  Again, however, that proved not to be the case.

Bryant did not return the signed document to Liberty Mutual for

approximately two weeks.  Bryant Deposition, Volume II, at 133.

She says she delayed returning the document because she had

questions about it that she wished to discuss with her contact in

the human resources department.  <u>Id</u>. at 135.

At some point after Bryant signed and returned a copy of the Severance Agreement, a representative of the company informed Bryant that she would be sending along a virtually identical version of the agreement for Bryant's signature.  She explained that the original agreement had been updated and, in any event, Bryant had neglected to initial the final page of the document she provided to Liberty Mutual.[1]  Notwithstanding her claims about coercion, duress, and threats of termination, Bryant also signed the updated severance agreement on March 10, and she returned that document to Liberty Mutual a week later - approximately one month after she received the original version.

Parenthetically, the court notes that neither party's behavior is consistent with Bryant's assertion that Liberty Mutual coerced and/or fraudulently induced her to sign the Severance Agreement.  She was not pressured to sign it at her workplace.  Instead, a copy of the Severance Agreement was sent to her home, by e-mail.  She had ample time to review the document, discuss it with her husband as she wished, consider her options, and, if she chose, consult an attorney.  If Liberty Mutual had been trying to coerce her into signing the Severance

---

[1]     The only change on the updated severance agreement appears to have been the inclusion of a new sentence that provided, "A photocopy, facsimile, electronic, pdf or other copies shall have the same effect for all purposes as an Ink-signed original."

Agreement without first considering its implications, and prior
to contacting an attorney, it is unlikely that it would have
afforded her so much time for reflection.  Nor is it likely that
Liberty Mutual would have given her additional time by seeking
her signature to a "revised" release that contained only minor,
non-substantive changes.

    Despite the assertions of duress and coercion raised in her
amended complaint and her legal memorandum, Bryant testified at
her deposition that she chose the "mutual separation" option
presented by Liberty Mutual and signed the Severance Agreement
because she wanted to preserve her ability to collect
unemployment benefits.

> Can I just be very blunt and honest, because I think it
> will just get this done?  I signed this document
> because I needed unemployment [benefits], because I
> didn't know where my next job was coming from.  And
> when you're faced with a choice, you walk out or you
> get fired, and in both of those cases you're not going
> to get unemployment, in both of those cases; [if
> signing the document] will allow you to collect that
> lousy $457 a week, you sign this document.  I had no
> choice.

Bryant Deposition, Volume II, at 152.

## Discussion

    In her ten-count amended complaint, Bryant advances claims
of age discrimination (under state and federal law),

"constructive discharge," wrongful termination, retaliatory discharge, fraudulent inducement, undue influence, fraudulent misrepresentation, negligent misrepresentation, and "enhanced compensatory damages."  The complaint is somewhat confusing because some of those counts describe what are more properly interposed as defenses to a contract enforcement action, rather than free-standing legal causes of action; one count describes a potential remedy (enhanced compensatory damages) rather than a recognized legal cause of action; and "constructive discharge" is not a cause of action but, rather, a means by which to establish one of the essential elements of a claim for wrongful termination.  See, e.g., Lacasse v. Spaulding Youth Center, 154 N.H. 246, 248-249 (2006).  Nevertheless, it is plain that if the Severance Agreement is valid and enforceable against Bryant, each of her claims against Liberty Mutual is barred.  Accordingly, the court turns to that issue first.

        In support of her claim that the Severance Agreement is not enforceable against her (or, at a minimum, that it does not serve to bar the particular claims she advances in this case), Bryant presses two related arguments.  First, she says that despite having signed the Severance Agreement (not once, but twice), she did not "knowingly and voluntarily" release her age discrimination and other employment-related claims against

Liberty Mutual.  That is to say, she claims she signed the
agreement under duress and as a result of unlawful coercion
applied by Liberty Mutual's agents.  And, with regard to her
federal age discrimination claim, she says the Severance
Agreement is unenforceable because it fails to meet the strict
requirements imposed by the Older Workers Benefit Protection Act.

Next, she seems to argue that either the Severance Agreement
does not actually bar her from pursuing the claims in her amended
complaint or, at a minimum, that she did not believe that by
signing the Severance Agreement she would be waiving those
claims.  She also says that Liberty Mutual's human resources
representative fraudulently induced her to sign the Severance
Agreement by reinforcing that misunderstanding and assuring her
that she was not waiving or releasing her right to bring suit
against Liberty Mutual.

I.   <u>The Older Workers Benefit Protection Act</u>.

Bryant says the Severance Agreement is unenforceable - at
least as to her federal age discrimination claim - because it
fails to meet the stringent requirements of the Age
Discrimination in Employment Act ("ADEA"), as amended by the
Older Workers Benefit Protection Act, 29 U.S.C. § 626(f)
("OWBPA").  In 1990, Congress enacted the OWBPA to resolve a

10

split among the circuits over how to properly determine when an employee's waiver of rights under the ADEA was knowing and voluntary.  See American Airlines, Inc. v. Cardoza-Rodriquez, 133 F.3d 111, 117 (1st Cir. 1998).  Under the OWBPA, for an employee's waiver of ADEA claims to be "knowing and voluntary," the release must meet certain minimum requirements:

1.   It must be written in a manner calculated to be understood by the employee signing the release, or the average individual eligible to participate;

2.   It must specifically refer to claims arising under the ADEA;

3.   It must not purport to encompass claims that may arise after the date of signing;

4.   The employer must provide consideration for the release of an ADEA claim above and beyond that to which the employee would otherwise already be entitled;

5.   The employee must be advised in writing to consult with an attorney prior to executing the agreement;

6.   The employee must be given at least 21 days to consider signing the release (that period is extended to 45 days if the incentive is offered to a group or class of employees); and

7.   The release must allow the employee to rescind the agreement for up to 7 days after signing.

See 29 U.S.C. § 626(f)(1)(A)-(G).


In this case, Liberty Mutual plainly drafted the Severance Agreement with the requirements imposed by the OWBPA in mind.

11

Not surprisingly, then, it satisfies each of those requirements. See, e.g. Pallonetti v. Liberty Mutual, 2011 WL 519407, *4 (S.D.N.Y. Feb. 11, 2011) (concluding that a substantially similar (if not identical) severance agreement and general release drafted by Liberty Mutual met the requirements of the OWBPA).

Bryant's claims that the Severance Agreement falls short of the OWBPA's requirements (or that it is otherwise unenforceable) because she was not given sufficient time "to read and think about the advantages and disadvantages of the release before signing it," because she failed to consult an attorney before signing, and because she was not offered consideration beyond anything to which she was already entitled, are unavailing. See Plaintiff's Memorandum at 16.[2]

---

[2]    Bryant claims she received inadequate consideration for having signed the Severance Agreement because she was "only provided with the seven (7) weeks of severance which she was already entitled to, given the number of years she worked at Liberty." Plaintiff's Memorandum at 17 (emphasis supplied). That is incorrect. Liberty Mutual's "Severance Pay Plan" unambiguously provides that an employee who otherwise qualifies for severance payments under the terms of the plan may only receive such benefits if she "execute[s] a release of all employment related claims in favor of the Company." Liberty Mutual Group Severance Pay Plan (document no. 54-8) at page I-2. Consequently, receipt of severance benefits was conditioned upon Bryant's execution of the Severance Agreement, thereby releasing all of her employment-related claims.

II.  <u>Duress and Coercion</u>.

Bryant claims she was forced to choose from three options: allow the disciplinary process against her to proceed and face inevitable discharge for cause; quit voluntarily; or agree to the "mutual separation" proposed by Liberty Mutual (i.e., sign the Severance Agreement and accept severance benefits).  Because she found two of those choices to be unpalatable, she asserts that Liberty Mutual "coerced" her, subjected her to "duress," and, therefore, forced her to elect the third option: signing the agreement.  <u>See, e.g.</u> Bryant Deposition, Vol. II, at 178-79.  For that reason, she says the Severance Agreement is unenforceable. She is mistaken.

The New Hampshire Supreme Court has recognized that, "[a]s a practical matter, the claim of undue duress is essentially a claim that the agreement was not signed voluntarily."  <u>In re Estate of Hollett</u>, 150 N.H. 39, 42 (2003) (quoting 3 C. Douglas, <u>New Hampshire Practice, Family Law</u> § 1.05, at 12 (2002)).  To invalidate a contract on the basis of duress, "a party must show that it involuntarily accepted the other party's terms, that the coercive circumstances were the result of the other party's acts, that the other party exerted pressure wrongfully, and that under the circumstances the party had no alternative but to accept the

terms set out by the other party."   In re Yannalfo, 147 N.H. 597, 599 (2002) (citation omitted).

Bryant's counsel explains her decision to voluntarily separate from Liberty Mutual, sign the agreement, and accept severance payments as follows:

> The only reason Bryant signed the Severance is because she was threatened by Liberty that she would be terminated for gross misconduct, that prospective employers would be notified of [the] same, and Bryant would not be eligible for unemployment benefits. Bryant was not given any choice by Liberty but to sign the Severance under duress.

Plaintiff's Memorandum (document no. 56-1) at 6-7.  That characterization is not entirely consistent with Bryant's own "blunt and honest" deposition testimony, quoted above.  See also Bryant Deposition, Vol. II, at 183 ("I signed it because I needed the severance so that I could get through that - so that I could collect unemployment.").  Moreover, Liberty Mutual denies that it threatened Bryant or that she was ever told that she would be "terminated for gross misconduct."  But, even accepting counsel's characterization, still, it does not, standing alone, render the Severance Agreement unenforceable.

As noted above, Bryant testified that the options available to her were limited.  If she thought she was being treated

unlawfully, she could have quit.  Alternatively, she could have
allowed the disciplinary process to take its course and await
Liberty Mutual's response.  In either event, she would have
preserved her ability to bring suit against Liberty Mutual for
whatever unlawful conduct she believed it had undertaken.  But,
of course, she likely would have been ineligible for any
unemployment benefits if it were determined later that she quit
voluntarily or was discharged for cause.  Her third option was to
sign the Severance Agreement, retain her eligibility for
unemployment benefits, accept severance payments from Liberty
Mutual, and waive her rights to bring any legal claims against
it.

     To be sure, Bryant faced a difficult choice.  Difficulty in
choosing, however, does not equate to "coercion" in the legal
sense, nor does it mean that Bryant executed the Severance
Agreement under duress.  The financial stress associated with the
loss of a job is not, without more, sufficient to warrant the
conclusion that an employee was acting under duress or a legal
incapacity when she executed a release of claims.  See Melanson
v. Browning-Ferris Indus., 281 F.3d 272, 277 (1st Cir. 2002).
"To hold otherwise would be to make it virtually impossible for
employers and employees to enter into binding settlements of

employment disputes occasioned by job losses, lay-offs and the like." Id.

On the record presented, there is no plausible basis to conclude that Bryant was "forced" to sign the Severance Agreement, or that she was under duress or any other type of legal incapacity. The Severance Agreement is written in plain, easily understood language. It expressly, unambiguously, and unmistakably discloses that, by signing it, Bryant is forever waiving her right to bring any then-accrued claims against Liberty Mutual, including a non-exhaustive list of more than 20 specifically identified state and federal causes of action. And, in capital letters, immediately above Bryant's signature, the Severance Agreement clearly provides that:

> EMPLOYEE ALSO UNDERSTANDS THAT BY SIGNING THIS
> AGREEMENT, EMPLOYEE WILL BE WAIVING EMPLOYEE'S RIGHTS
> UNDER FEDERAL, STATE AND LOCAL LAW TO BRING ANY CLAIMS
> THAT EMPLOYEE HAS OR MIGHT HAVE AGAINST LIBERTY MUTUAL.
>
> EMPLOYEE HAS 45 DAYS TO CONSIDER THIS AGREEMENT.
> LIBERTY MUTUAL ADVISES EMPLOYEE TO CONSULT WITH AN
> ATTORNEY (AT EMPLOYEE'S EXPENSE) PRIOR TO SIGNING THIS
> AGREEMENT. . . . EMPLOYEE'S SIGNATURE BELOW CONSTITUTES
> EMPLOYEE'S ACKNOWLEDGMENT THAT EMPLOYEE HAS BEEN SO
> ADVISED, THAT EMPLOYEE HAS READ THE AGREEMENT, THAT
> EMPLOYEE FULLY UNDERSTANDS ITS TERMS, AND THAT EMPLOYEE
> KNOWINGLY AND VOLUNTARILY AGREES TO BE BOUND BY IT.

Id. at 4.

16

Not only was Bryant afforded, but she actually took ample time to review the document and think about the consequences of signing it.  She discussed it with her husband.  She certainly could have taken it to an attorney if she wished.  As was her prerogative, she chose not to do so, but not because Liberty Mutual placed any unreasonable time constraints upon her.  Her claim that the Severance Agreement is unenforceable because it is the product of duress and coercion is without legal merit.  See generally Pallonetti v. Liberty Mutual, 2011 WL 519407, *4-5 (S.D.N.Y. Feb. 11, 2011).

As an aside, the court notes that a contract signed under duress is not automatically void; instead, it is voidable.  See Tessier v. Rockefeller, 162 N.H. 324, 331 (2011).  Even if Bryant could establish that she signed the Severance Agreement under duress, she likely forfeited her ability to void the agreement on that ground by "failing to seek a remedy based on duress within a reasonable time after executing the [Severance Agreement]."  Vasapolli v. Rostoff, 39 F.3d 27, 35 n.5 (1st Cir. 1994) (citations omitted).  See also Keshishian v. CMC Radiologists, 142 N.H. 168, 173 (1997) ("While a contract that is the product of duress is voidable, it is well settled that a party cannot treat a contract as binding and as rescinded at the same time.  A contract made under duress will be deemed ratified if the

aggrieved party fails to repudiate the agreement within a
reasonable time after the duress has dissipated.") (citations and
internal punctuation omitted).[3]


III. <u>Fraudulent Inducement</u>.

    Finally, Bryant claims one particular sentence in the
Severance Agreement caused her to be confused about the scope of
the agreement's release provisions - confusion she says was
reinforced by fraudulent misrepresentations made to her by a
representative of Liberty Mutual.  The relevant portion of the
Severance Agreement provides as follows:

> **General Release of Claims.**  Employee hereby knowingly
> and voluntarily releases and forever discharges Liberty
> Mutual [and all related individuals and entities] from
> any and all claims, known or unknown that Employee
> . . . has or may have as of the date of Employee's
> execution of this Agreement.  This includes but is not
> limited to a release of (i) any clams arising out of
> Employee's employment with Liberty Mutual or Employee's
> separation from that employment; (ii) all claims
> brought by Employee or on Employee's behalf in any
> pending lawsuits or other proceedings; (iii) any rights
> or claims that Employee may have pursuant to the
> Severance Plan or any other severance plan or agreement
> in which Employee may claim to have participated, other
> than for the Severance Pay described [above]; and any
> rights or claims that Employee may have pursuant to:

---

[3]    Of course, a party cannot ratify a release of ADEA
claims that does not comply with the Older Workers Benefit
Protection Act.  <u>See generally</u> <u>Oubre v. Entergy Operations, Inc.</u>,
522 U.S. 422 (1998).  But, because the Severance Agreement meets
the strict requirements imposed by the OWBPA, it is presumably
possible for Bryant to have ratified that agreement by failing to
bring a timely action to invalidate it.

> [here, the Severance Agreement lists more than 20 state
> and federal claims and causes of action, including the
> "Age Discrimination in Employment Act, as amended, 29
> U.S.C. § 621 et seq."].

Severance Agreement at 1-2.  That section of the Severance
Agreement concludes with the following sentence: "Employee is not
waiving his or her right to bring claims that cannot be released
as a matter of law."  <u>Id</u>. at 2.


     Despite the breadth and detail of the release language,
Bryant says that final sentence led her to believe that she was
<u>not</u> waiving any of the claims she is currently pursuing against
Liberty Mutual, including her claim under the Age Discrimination
in Employment Act.  <u>See, e.g.</u>, Bryant Deposition, Vol. I, at 175
(when asked what she made of the fact that the caption to
paragraph 5 of the Severance Agreement is "General Release of
Claims," Bryant testified that, "I made nothing of it.  When I
got down here and it says that I am not waiving my right to bring
claims that cannot be released as a matter of law.").  It
probably bears noting that, subsequently, Bryant testified that
she did not know whether her claims under the ADEA were of the
type that "cannot be released as a matter of law."  <u>See</u> Bryant
Deposition, Vol. II, at 142-43 and 146-47.  Moreover, she never
explained why she believed that despite the fact that the
Severance Agreement <u>specifically lists</u> claims under the ADEA as

among those that she was waiving, she was still free to pursue
such claims against Liberty Mutual.  <u>See</u> Severance Agreement at
para. 5.

But, says Bryant, as unreasonable and implausible as her
interpretation of the Severance Agreement may be, it was
reinforced by fraudulent assurances given to her by the human
resources representative.  <u>See</u> Bryant Deposition, Vol. 2, at 140
("She said if you read through the document, it says right in
there that you're not waiving your rights.  You can't waive your
right.  Liberty Mutual can't ask you to waive your rights if they
did something wrong.").  <u>See also</u> Amended Complaint at para. 35
(alleging that Bryant was told "that by signing the severance
agreement [she] was not giving up her right to bring a claim
against Liberty and the language in the severance agreement only
protected Liberty if it did no wrong.").  Thus, says Bryant, she
was fraudulently induced to sign the Severance Agreement.

Under New Hampshire law, fraud in the inducement is a valid
defense to a contract action and can be raised to void a
contract.  <u>See, e.g.,</u> <u>Nashua Trust Co. v. Weisman</u>, 122 N.H. 397,
400 (1982).  And, contrary to Liberty Mutual's suggestion, the
presence of an integration clause in the Severance Agreement does
not bar Bryant's fraudulent inducement claim.  <u>See, e.g.,</u> <u>Van Der</u>

Stok v. Van Voorhees, 151 N.H. 679, 682 (2005) ("[N]either a
standard merger clause, nor the parol evidence rule, bars an
action for fraud.") (citations omitted).  But, as the party
seeking to invalidate the Severance Agreement on grounds of
fraudulent inducement, Bryant bears a substantial burden: she
"must establish that the other party made a representation with
knowledge of its falsity or with conscious indifference to its
truth with the intention to cause another to rely upon it.  In
addition, the party seeking to prove fraud must demonstrate
justifiable reliance."  Id. (citing Snierson v. Scruton, 145 N.H.
73, 77 (2000)).

The standard of justifiable reliance "is not that of
ordinary care, but an individual standard, based upon
[plaintiff's] own capacity and knowledge."  Smith v. Pope, 103
N.H. 555, 559 (1961).  It is, in short, a subjective standard,
rather than an objective "reasonable person" standard.
Consequently, Bryant's educational level, intelligence,
experience in the business world, and common sense are all
relevant in determining whether reliance was justified.  As the
United States Supreme Court has observed:

> [The] contrast between a justifiable and reasonable
> reliance is clear: "Although the plaintiff's reliance
> on the misrepresentation must be justifiable, this does
> not mean that his conduct must conform to the standard
> of the reasonable man.  Justification is a matter of

21

> the qualities and characteristics of the particular
> plaintiff, and the circumstances of the particular
> case, rather than of the application of a community
> standard of conduct to all cases."

Field v. Mans 516 U.S. 59, 70-71 (1995) (quoting Restatement

(Second) of Torts, § 545A, comment b).  See also Restatement

(Second) of Torts, § 541, comment a ("Although the recipient of a

fraudulent misrepresentation is not barred from recovery because

he could have discovered its falsity if he had shown his distrust

of the maker's honesty by investigating its truth, he is

nonetheless required to use his senses, and cannot recover if he

blindly relies upon a misrepresentation the falsity of which

would be patent to him if he had utilized his opportunity to make

a cursory examination or investigation.").


    For purposes of addressing Liberty Mutual's motion, the

court necessarily accepts that the human resources representative

actually made the statements Bryant attributes to her -

statements that contradict the plain language of the Severance

Agreement.  It will also assume that Bryant truly believed that,

despite signing the Severance Agreement, she was not releasing

any of the employment-related claims she now advances against

Liberty Mutual.  Still, Bryant cannot, as a matter of law,

prevail on her claim of fraudulent inducement.

It is difficult to imagine a legal document that more clearly and unambiguously describes its purpose and legal effect than the severance agreement at issue in this case.  First, and perhaps foremost, it complies with all of the strict requirements imposed by the Older Workers Benefit Protection Act - legislation that was enacted to make certain that such documents are drafted in simple language that clearly and unambiguously explains exactly what rights an employee is releasing, thereby insuring that the employee's decision to release those rights is both knowing and voluntary.  Moreover, the agreement includes the words "general release" in its title; it goes on to use the word "release" a total of 19 times; the word "waive" appears five times; it clearly provides that the employee "knowingly and voluntarily releases and forever discharges Liberty Mutual . . . from any and all claims, known or unknown;" it specifically lists numerous examples of the types of claims that are being released, including those under the ADEA; it unambiguously (and in capitalized typeface) states that the employee is being provided severance benefits in exchange for her agreement to release any and all legal claims against Liberty Mutual; and it makes clear that severance benefits are only available if the employee releases his or her claims against Liberty Mutual.

23

It is entirely unclear why Bryant thought Liberty Mutual was giving her severance benefits if not in exchange for a complete release of claims, or why it was insisting that, to receive those benefits, she must first execute the agreement.  Bryant obviously recognized that the Severance Agreement had substantial legal significance.  She acknowledged that she read it; she understood that it provided 45 days within which to review it, as well as an additional seven days after signing within which to revoke her assent; and she realized that it specifically (and in capitalized typeface) advised her to consult legal counsel before making any decision to sign it.  She is also literate, reasonably well-educated, and intelligent.  And, given her employment history in administrative managerial positions, she must be presumed to understand the purpose of the bargained-for exchange represented by the Severance Agreement; in return for her waiver of all then-accrued legal claims and the elimination of any possible employment-related lawsuits, Liberty Mutual agreed to provide her with a valuable benefit that she very much desired: severance payments.

In light of all those facts, Bryant's asserted interpretation of the Severance Agreement is so plainly contrary to the clear language of the document that it is, as a matter of law, unreasonable.  To the extent she claims to have actually

relied upon fraudulent assurances from the human resources representative to the effect that, despite signing the agreement, she could still bring employment-related claims against Liberty Mutual - even claims that the Severance Agreement specifically identifies as being waived - such reliance was patently unjustified.  See, e.g., Field, 516 U.S. at 70-71 (noting that reliance is not "justified" when, "under the circumstances, the facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance, or [she] has discovered something which should serve as a warning that [she] is being deceived.") (quoting W. Prosser, Law of Torts, § 108, p 718 (4th ed. 1971).  See also Restatement (Second) of Torts, § 541, comment a ("Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect."); Pierce v. Atchison, Topeka and Santa Fe Ry. Co., 65 F.3d 562, 569-70 (7th Cir. 1995) ("The Illinois defense of fraudulent inducement also requires proof of reasonable reliance, so cases discussing reasonableness in that context are instructive to the resolution of our issue. Fraudulent inducement is not available as a defense when one had the opportunity to read the contract and by doing so could have discovered the misrepresentation.") (citation omitted).

25

Little more need be said.  In light of Bryant's educational
level, intelligence, and years of experience in the business
world, she cannot, as a matter of law, show that she justifiably
relied upon the misleading representations allegedly made by
Liberty Mutual's human resources representative.  Consequently,
she has not borne her burden of demonstrating that she was
fraudulently induced to sign the Severance Agreement.  Given the
record evidence, a rational and properly-instructed jury could
reach only one conclusion in this case: that Bryant knowingly and
voluntarily executed the Severance Agreement and released any
then-accrued claims against Liberty Mutual in exchange for the
receipt of severance benefits, excepting only those claims for
which the law will not recognize a waiver.  Here, there are no
such claims.  The Severance Agreement is, therefore, valid and
enforceable.  And, because Bryant released all of the claims she
seeks to pursue in this litigation, Liberty Mutual is entitled to
judgment as a matter of law on all counts in Bryant's amended
complaint.


IV.  Liberty Mutual's Counterclaims.

In its amended answer, Liberty Mutual advances three
counterclaims against Bryant: breach of contract (for having
filed suit despite having signed the Severance Agreement); unjust
enrichment (for having retained the severance benefits); and

fraud (for having allegedly signed the Severance Agreement with no intention of actually honoring it).  Those counterclaims can be addressed relatively briefly.

Fairly construed, Bryant's complaint seeks not simply damages for unlawful termination but, necessarily, a judicial determination that the Severance Agreement is not enforceable for all the reasons previously discussed.  Plainly, absent such a judicial determination, Bryant's claims arising out of allegedly wrongful conduct related to her separation from the company would be barred.  And, at least under the circumstances presented in this case, Bryant did not breach the Severance Agreement by seeking a judicial determination that the contract itself is void or voidable.[4]

Liberty Mutual's unjust enrichment claim is equally unavailing.  Because the court has held the Severance Agreement to be valid and enforceable against Bryant, she is entitled to retain the severance payments.  Liberty Mutual's unjust

---

[4]    Parenthetically, the court notes that even if Liberty Mutual were able to pursue and prevail on a breach of contract theory, its damages, if any, would be negligible.  Under the so-called "American Rule," it would not be entitled to an award of attorney's fees.  And, the Severance Agreement does not contain any provision requiring Bryant to reimburse Liberty Mutual for its attorney's fees should she try and fail to have the contract declared unenforceable.

enrichment claim is, therefore, moot.  Finally, Liberty Mutual's claim that Bryant fraudulently entered into the Severance Agreement despite knowing that she never intended to honor it is unsupported by the record.  And, like the unjust enrichment claim, it is moot in light of the court's holding that the Severance Agreement is valid and enforceable.

## Conclusion

For the foregoing reasons, Liberty Mutual's motion for summary judgment (document no. 54) is granted as to all counts in plaintiff's amended complaint.  As to Liberty Mutual's counterclaims, however, the motion is denied; the record establishes that Bryant is entitled to judgment as a matter of law on those counterclaims and/or that they are moot.

Plaintiff's motion to allow the use and disclosure of Liberty Mutual's work product that was inadvertently disclosed during discovery (document no. 55) is denied.  As Liberty Mutual argues, that two-page document is likely privileged.  Moreover, the document is comprised entirely of hearsay.  Consequently, even if it were not privileged, it would not be properly admitted in opposition to summary judgment.  See Fed. R. Civ. P. 56(c).  Finally, Liberty Mutual's motion to strike (document no. 65) is denied as moot.

28

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____

Steven J. McAuliffe
United States District Judge

May 31, 2013

cc:  John E. Lyons, Jr., Esq.
     Douglas J. Hoffman, Esq.
     Martha Van Oot, Esq.
     Debra W. Ford, Esq.
     K. Joshua Scott, Esq.